DECISION
This case is before the Court on Vincent DiPaolo's ("DiPaolo") appeal from a decision of the Rhode Island Department of Business Regulation ("the DBR"). After an administrative hearing, the DBR revoked DiPaolo's insurance claims adjuster and motor vehicle damage appraiser licenses pursuant to G.L. 1956 §§ 27-10-7 and 27-10.1-1(e). For the reasons set forth below, this Court affirms the DBR's decision. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I FACTS AND TRAVEL
This case arises out of a business arrangement between DiPaolo — then a licensed insurance claims adjuster and motor vehicle damage appraiser — and Ms. Mariah Nelson ("Nelson") in April 2005.[1]
(DBR Dec. at 3.) After a serious auto accident, Nelson *Page 2 
brought her vehicle to DiPaolo on the advice of a mutual friend.Id. at 3. Although Nelson was under the impression that she was hiring DiPaolo to repair her vehicle, she instead executed a document that authorized DiPaolo to negotiate a settlement of her claim on her behalf. (DBR Ex. 3; 09/18/2006 Tr. at 10:7-18, 34:5-24.) The authorization form made specific note of the fact that DiPaolo would not be "acting in the capacity of a repair facility." (DBR Ex. 3.) Nelson also signed a form directing her insurer to disburse her settlement funds to United Auto Sales, Inc. ("United Auto"). See DBR Dec. at n. 3 (explaining that United Auto is a corporation owned by Carol DiPaolo); DBR Ex. 4. The record makes no mention of DiPaolo's relationship or connection with either Carol DiPaolo or United Auto. Id. Despite the fact that Nelson believed that DiPaolo would repair her car and that neither document executed by Nelson referenced the hiring of other auto repair shops, DiPaolo apparently labored under the belief that Nelson had hired him to negotiate a settlement with her insurance company and to "negotiate with a certified auto repair facility to repair her vehicle." Id. at 5; DBR Ex. 1.[2] A witness for DiPaolo testified that Nelson asked DiPaolo to use the insurance settlement proceeds to *Page 3 
make repairs and improvements unrelated to the April 2005 accident to her car; Nelson denied having made these requests. (12/12/2006 Tr. at 16:7-20, 26:18-20; 09/18/2006 Tr. at 38:21-39:1-24.)
Nelson's insurer hired a company to appraise the damage to the car. (DBR Dec. at 5.) This company estimated a cost of $9348.20 to repair the vehicle and notified DiPaolo that the car was a "borderline" total loss. Id. at 5; DBR Ex. 1. Based on this appraisal, DiPaolo negotiated a settlement of $8848.20, an amount equal to the appraised cost minus Nelson's $500 deductible. (DBR Dec. at 5-6.) DiPaolo hired two auto repair shops to make a combined $4750 in repairs to Nelson's car. Id. at 6. He did not turn over the difference between the $8848.20 in settlement funds and the $4750 in repairs to Nelson. See id. at 6.
Nelson was dissatisfied with the quality of the repairs that DiPaolo had arranged for her car. See
09/18/2006 Tr. at 13:14-19, 15:6-16:15. After Nelson retrieved her vehicle from DiPaolo, her insurer hired an appraiser to conduct another inspection. (DBR Dec. at 7.) The appraiser testified that the vehicle as repaired was unsafe to drive, that repairs listed in the original appraisal had not been made, that parts that needed to be replaced had not been replaced, and that the few repairs that had been done were worth only approximately $3000 to $3300.Id. at 7-8; 10/06/2006 Tr. at 22:20-23:2, 43:11-16, 45:19-22, 46:5-47:1.
DiPaolo presented evidence that he applied the unused portion of Nelson's insurance settlement to offset certain expenses that Nelson had incurred while her car was being repaired. (DBR Dec. at 21-22; DBR Ex. 1.) In his letter to his attorney, DiPaolo explained that he allowed Nelson to use four different courtesy vehicles while her car was *Page 4 
being repaired, and that Nelson damaged each of these vehicles. (DBR Ex. 1.) According to DiPaolo, Nelson informed a man named John Voller — apparently an employee of either DiPaolo or of United Auto — that he should use the insurance settlement money to repair the damage she caused to the courtesy vehicles. (DBR Ex. 1.) Nelson testified that she used four different courtesy vehicles but that she did not cause any damage to the first three vehicles. (09/18/2006 Tr. at 56:4-58:2, 59:14-61:10.) She agreed that the fourth courtesy vehicle had sustained damage as a result of a "hit-and-run" incident. Id. at 61:11-62:20; DBR Ex. 13. Nelson denied that she ever agreed to allow DiPaolo or United Auto to apply any of her insurance proceeds to repair the courtesy vehicles. (09/18/2006 Tr. at 63:14-64:1.) No written documentation of this alleged side-agreement was presented at the hearing. (DBR Dec. at 22.)
Based on Nelson's testimony regarding his experiences with DiPaolo, the DBR sought to revoke DiPaolo's insurance claims adjuster and motor vehicle damager appraiser licenses on the following grounds: (1) that DiPaolo had been operating an unlicensed auto body shop; (2) that DiPaolo had failed to serve his customer's interests and that his continued licensure was not in the public interest; and (3) that DiPaolo had violated a consent order that he and the DBR had entered into in April 1999. Id. at 2. The DBR held hearings on September 18, October 6, and December 12, 2006 and January 19, 2007 and issued a written decision on December 21, 2007.Id. at 28. The Hearing Officer found that the DBR had not established by a preponderance of the evidence that DiPaolo had been operating an auto repair shop without a license. Id. at 27. However, the Hearing Officer revoked DiPaolo's appraiser and adjuster licenses on the grounds that his continued licensure would not serve the public interest and for cause. Id. at 27. *Page 5 
In addition, the Hearing Officer held that DiPaolo's violation of the April 1999 Consent Order (the "Consent Order") was an alternative basis for revoking the motor vehicle damage appraiser license. Id. at 28. He did not reach the issue of whether violation of the Consent Order furnished alternative grounds for revoking the insurance claim adjuster license. Id.
The Hearing Officer's decision that DiPaolo's licenses should be revoked both for cause and for considerations related to the public interest is predicated on three conclusions: (1) that DiPaolo's "woefully inadequate business practices demonstrate a level of incompetence that seriously calls into question his fitness to be licensed in the public adjuster profession"; (2) that DiPaolo failed in his duty to represent Nelson's interests; and (3) that DiPaolo "took advantage of Ms. Nelson's situation and used his insurance claim adjuster license to inure a benefit for himself."Id. at 19. In response to DiPaolo's explanation that he had retained the balance of Nelson's insurance settlement funds to offset the cost of the alleged damage to the four courtesy vehicles, the Hearing Officer found that there had been no oral or written agreement to use the settlement funds to repair the courtesy vehicles. Id. at 22. The Hearing Officer did not make factual findings regarding whether the loaned vehicles had been damaged or the cost of the damage. DiPaolo timely appealed the DBR's decision.
 II STANDARD OF REVIEW
The scope of the Court's review is limited by the Rhode Island Administrative Procedures Act, which mandates that:
 "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of *Page 6 
fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 42-35-15(g).
Accordingly, this Court defers to the administrative agency's factual determinations provided that they are supported by legally competent evidence. Arnold v. Rhode Island Department of Laborand Training Board of Review, 822 A.2d 164, 167 (R.I. 2003). Legally competent evidence is "`some or any evidence supporting the agency's findings.'" Auto Body Association of Rhode Island v.Department of Business Regulation, 996 A.2d 91, 95 (R.I. 2010) (quoting Environmental Scientific Corp. v. Durfee,621 A.2d 200, 208 (R.I. 1993)).
This Court reviews questions of law de novo. Narragansett WireCo. v. Norberg, 118 R.I. 596, 607, 376 A.2D 1, 6 (1977). "`When a statute is clear and unambiguous we are bound to ascribe the plain and ordinary meaning of the words of the statute.'" Town ofBurrillville v. Pascoag Apartment Associates, 950 A.2d 435, 445
(R.I. 2008) (quoting Unistrut Corp. v. State Department of Laborand Training, 922 A.2d 93, 98 (R.I. 2007)). *Page 7 
However, the Court will defer to an agency's interpretation of an ambiguous statute "`whose administration and enforcement have been entrusted to the agency * * * even when the agency's interpretation is not the only permissible interpretation that could be applied.'"Auto Body Association of Rhode Island, 996 A.2d at 97 (quotingPawtucket Power Associates Limited Partnership v. City ofPawtucket, 622 A.2d 452, 456-57 (R.I. 1993)) (redactions in original). The Court will not defer to an agency's statutory interpretation if it is "`clearly erroneous or unauthorized.'"Id. (quoting Unistrut Corp., 922 A.2d at 99).
 III ANALYSIS
DiPaolo appeals the DBR's decision to revoke his licenses for the following reasons: (1) that the Hearing Officer committed an error of law and violated statutory provisions when he revoked DiPaolo's licenses for conduct that fell outside the scope of practice of an adjuster or appraiser; (2) that the Hearing Officer erred when he characterized DiPaolo's duty to Nelson as a fiduciary duty; (3) that the Hearing Officer committed error of law and made a clearly erroneous factual finding when he found that DiPaolo wrongfully withheld the balance of Nelson's insurance settlement funds from her; (4) that the Hearing Officer erred when he found that DiPaolo violated the April 1999 Consent Order; and (5) that imposition of the harshest sanction — revocation — was an arbitrary and capricious abuse of the Hearing Officer's discretion. The Court will discuss the issues that are relevant to the outcome of this Decision. *Page 8 
 A "Scope of Practice" Argument
DiPaolo argues that the Hearing Officer committed an error of law by disciplining him pursuant to §§ 27-10-7 and 27-10.1-1(e) for conduct that one does not require a professional license to do. Specifically, DiPaolo points out that the DBR neither alleged nor proved that he had conducted an appraisal of Nelson's vehicle; therefore, DiPaolo contends, the conduct that was the subject of the DBR hearing should not implicate his appraiser license. In addition, DiPaolo argues that he served as a claims adjuster while he negotiated a settlement with Nelson's insurance company but then switched hats to a consultant role when he arranged for the repair of the vehicle. In DiPaolo's view, the DBR may only discipline him under the adjuster and appraiser statutes for conduct in which he engages in his roles as an adjuster or an appraiser. For the reasons set forth below, the Court finds that the Hearing Officer did not err in disciplining DiPaolo for conduct that falls outside the scope of an appraiser's or an adjuster's typical field of endeavor.
Sections 27-10-7 and 27-10.1-1(e) of the General Laws confer the authority to suspend or revoke adjuster and appraiser licenses upon the insurance commissioner. The section pertaining to claim adjusters states:
 "[n]othing in this section shall be construed to limit the authority of the insurance commissioner to sooner suspend [sic] or revoke any claim adjuster license. Any action for suspension or revocation . . . shall be. . .upon proof that the license was obtained by fraud or misrepresentation, or that the interests of the insurer or the interests of the public are not properly served under the license, or for cause." Section 27-10-7. *Page 9 
The statute pertaining to motor vehicle damage appraisers is identical in all relevant respects to § 27-10-7.See §§ 27-10-7, 27-10.1-1(e). The parties propound conflicting interpretations of these statutes. DiPaolo essentially argues that the phrase "under the license" means something akin to "as a direct result of the license." This interpretation would empower the agency to discipline DiPaolo only for conduct undertaken as a result of his having a professional license — that is, conduct that falls squarely within the statutory definitions of claim adjusters and damage appraisers. The DBR propounds an interpretation of the statutes which would allow the commissioner to revoke licenses if the interests of the public were not served by the licensee's continued authorization to practice, regardless of whether the questionable conduct fell within the scope of practice.
Neither of the interpretations suggested by the parties is unreasonable. Depending on the context, "under" can mean "in accordance with" or "subject to the influence, condition, force, etc., of[.]" The Random House Dictionary of the English LanguageUnabridged 2059 (2nd ed. 1987). The reading of the phrase "under the license" urged by DiPaolo is consistent with common usage.See Tinney v. Tinney, 770 A.2d 420, n. 3 (R.I. 2001) (in which Rhode Island Supreme Court uses the phrase "did plumbing work under a license issued to [another plumber]" to indicate that authority for plumbing work emanated from a license).
The reading adopted by the Hearing Officer is similarly reasonable and consistent with common usage. The agency essentially interprets the phrase "interests of the public are not properly served under the license" to mean not properly served by the license.See The Random House Dictionary of the English LanguageUnabridged 2059 (defining *Page 10 
"under" as "during the rule, administration, or government of" and "in the state or process of") see also State v.Ritchie, 136 So. 11, 15 (La. 1931) (in which the Court determined the words `under' and `by' conveyed the same idea and meant the same thing within the context of obtaining money under false pretenses). This grammatically-sound and logical interpretation is buttressed by the broad authority granted to the insurance commissioner to revoke or suspend licenses as needed. See §§ 27-10-7 and 27-10.1-1(e) (both of which state that "[n]othing in this section shall be construed to limit the authority of the insurance commissioner to sooner suspend [sic] or revoke any. . .license").
The State's intent to protect the interests of the public supports the Hearing Officer's interpretation of the statutes. Even if the questionable conduct of the claim adjuster is not directly related to his or her license, the tenor of § 27-10-7 indicates a clear legislative intent to ensure that only trustworthy individuals are licensed as claims adjusters. See § 27-10-7; seealso, Martone v. Johnston School Committee,824 A.2d 426, 431 (R.I. 2003) ("When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent."). The statute enumerates two specific instances that warrant a revocation of a license. "Any action for suspension or revocation . . . shall be . . . upon proof that the license was obtained by fraud or misrepresentation." Id. The statute also provides a catch-all provision that grants the insurance commissioner authority to suspend or revoke a license if "the interests of the insurer or the interests of the public are not properly served under the license, or for cause." Id. The statute makes no requirement that only conduct directly under the license be considered.See id. The provisions of § 27-10-7 create a regulatory framework that grants the insurance *Page 11 
commissioner broad authority to determine proper licensure based on competency, trustworthiness, and honesty in order to protect the interests of the public. See id.
Furthermore, the State has a long tradition of granting licenses that are subject to obligations of trustworthiness and competency. For example, the Rhode Island Supreme Court has long disciplined attorneys for unethical or criminal conduct that was not committed in their professional capacities. See Carter v.Cianci, 482 A.2d 1201, 1203 (R.I. 1984) (in which the Supreme Court disciplined an attorney for a violent assault despite the fact that the conduct did not "impugn the [lawyer's] honesty, integrity, or his skill as an attorney"). Additionally, in Larue v.Registrar of Motor Vehicles, a driving instructor's license was revoked by the RMV when the instructor engaged in "sexually oriented misconduct" with a student. 568 A.2d 755, 756 (R.I. 1990). The RMV's determination to revoke the driving instructor's license was pursuant to a statute which allowed such revocation for bad character and lack of fitness. The RMV also revoked the license of the instructor's driving school based on the same episode of misconduct and determination of lack of fitness. Id.
Within the context of an administrative appeal, where a statute is ambiguous — that is, susceptible of multiple reasonable interpretations — the Court defers to the interpretation of the agency that has been charged with administering and enforcing the statute. Auto Body Association of Rhode Island,996 A.2d at 97; see 2A Norman J. Singer, SutherlandStatutory Construction § 45:2 (7th ed. 2007) ("Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses."). This is so "`even when the agency's interpretation is not the only permissible interpretation that could be applied.'" Auto Body Association ofRhode *Page 12 Island, 996 A.2d at 97 (quoting Pawtucket PowerAssociates, 622 A.2d at 456-57). In this case, the DBR is the agency charged with administering and enforcing §§ 27-10-7 and27-10.1-1(e). For the reasons discussed above, the DBR's interpretation is not unreasonable, unauthorized, or clearly erroneous. See id. Accordingly, the Court defers to the agency's reasonable reading of the statutes. Thus, the Hearing Officer did not commit an error of law or act in excess of statutory authorization when he revoked DiPaolo's appraiser and adjuster licenses for conduct that he engaged in as a consultant.
 B Fiduciary Relationship
DiPaolo next asserts that the DBR's decision was affected by error of law because the Hearing Officer characterized the duty that DiPaolo owed to Nelson as a fiduciary duty. At the outset, the agency found that only ineptitude or malfeasance could explain the fact that DiPaolo returned Nelson's vehicle to her in an unsafe condition with only approximately $3000 to $3300 in repairs performed despite the availability of $8848.20 in insurance settlement funds. See DBR Dec. at 21. The agency succinctly wrote "he either knew or should have known that his client was being ill-served." Id. at 23. The agency then found that DiPaolo had a fiduciary duty to act in Nelson's best interests and use her insurance proceeds for proper purposes and that he failed in this duty, either by ineptitude or by wrongdoing. Id. at 20-21. DiPaolo construes the agency's holdings as an attempt to impose upon claim adjusters a duty to ensure that damages included in a motor vehicle damage appraisal are repaired. He further argues that he did not owe a fiduciary duty to Nelson. *Page 13 
The record evidences that the Hearing Officer held that in the context of a business arrangement in which Nelson apparently hired DiPaolo as a consultant to arrange for the repair of her vehicle and in which DiPaolo had a fiduciary duty to act in his customer's best interests, DiPaolo should have used the insurance money to return the vehicle to a safe condition rather than using it for other, unauthorized purposes. See id. at 20-21, 24. The Hearing Officer stated that "[r]espondent, with his knowledge of the industry, took advantage of the situation in order to inure a benefit for himself when he kept almost half of the insurance settlement. Either way, he did not act in a responsible manner in his role as a licensed public adjuster on behalf of Ms. Nelson."Id. at 21. The Hearing Officer's holding did not attempt to impose a blanket rule about ensuring that repairs are made upon claim adjusters.
Furthermore, the Hearing Officer did not err in holding that DiPaolo owed a fiduciary duty to Nelson. "The existence of a fiduciary duty is a fact-intensive inquiry." A.Teixeira Co. v. Texeira, 699 A.2d 1383, 1387 (R.I. 1997). The question of who is a fiduciary is not susceptible to "facile" analyses or blanket pronouncements. Id. at 1386-87. "A fiduciary duty arises when the facts show a special relationship of trust and confidence that requires the fiduciary to act in the other party's best interests." Fraioli v. Lemcke, 328 F.Supp.2d 250,267 (D.R.I. 2004). Such a relationship may arise when one party is dependent on the other for advice and information. SeeNotarantonio v. Notarantonio, 941 A.2d 138, 146 (R.I. 2008);see also Cahill v. Antonelli, 120 R.I. 879, 883,390 A.2d 936, 939 (R.I. 1978) (holding a breach of fiduciary duty occurred when a brother abused his position of trust and confidence with his sister, who was dependent on him for information regarding the disposition of family assets) and Thomson v. Cannon, *Page 14 274 Cal. Rptr. 608, 612 (Cal. App. 4 Dist. 1990) (holding that a fiduciary relationship will exist between an adjuster and an insured when the insured relies upon the honesty, integrity, and fidelity of the adjuster). This fiduciary duty is one of "the utmost good faith." Notarantonio, 941 A.2d at 145.
With regard to the fiduciary nature of the relationship between DiPaolo and Nelson, the Hearing Officer initially made a blanket pronouncement that "[a] public adjuster has . . . a relationship in which a fiduciary duty arises that requires the licensed adjuster to act in the other party's best interests." (DBR Dec. at 17-18.) However, the Hearing Officer then qualified said statement and narrowed his analysis by explaining why DiPaolo, in particular, owed a fiduciary duty to Nelson:
 "He [DiPaolo] knowingly undertook a fiduciary obligation to represent her [Nelson's] interests in a manner that was worthy of Ms. Nelson's total trust and required his good faith and honesty. A fiduciary is expected to have greater knowledge and expertise about the matters being handled than his or her client. In addition, there is a standard of conduct and trust above that of a stranger or of a casual businessperson owed to the client. As such, he or she must avoid "self-dealing" or "conflicts of interests" in which the potential benefit to the fiduciary is in conflict with what is best for the person who trusts him or her." Id. at 20.
The Hearing Officer relied upon the wording of the authorization form that Nelson executed, together with the fact that DiPaolo had superior knowledge and expertise in the field of claim negotiation and auto repair, to make his finding that DiPaolo had a fiduciary duty to Nelson. Id. The inference — that DiPaolo had superior knowledge and expertise in his fields of endeavor and that Nelson relied on this expertise — is a logical one that arises from DiPaolo's licensure to appraise damage to motor vehicles and to negotiate settlements with auto insurance companies. Seeid. Accordingly, the Hearing *Page 15 
Officer's finding that DiPaolo owed a fiduciary duty to Nelson was not clearly erroneous and did not prejudice substantial rights of the Appellant.
Furthermore, agency theory[3] may have furnished an additional ground for finding that DiPaolo's retention of the insurance proceeds was wrongful. The language of the authorization form explicitly authorized DiPaolo to act as an "agent" on behalf of Nelson, and the Hearing Officer hinted strongly at the existence of an agency relationship. The Hearing Officer noted:
 "When Ms. Nelson came to [DiPaolo], he had her sign an authorization form that appointed Respondent to "act in my place and stead with my permission and authority to negotiate, on my behalf, a settlement of my claim for property damage to my automobile[.]" It further states that Respondent would act as her agent "with respect to the handling of the loss to [her] automobile." The use of the word "agent" indicates that Respondent understood the nature of the relationship that he formed with Ms. Nelson. "(DBR Dec. at 20.)
However, the Hearing Officer's finding that DiPaolo was an agent of Nelson is ambiguous. Though initially recognizing that the authorization form indicated an agency relationship, the Hearing Officer later criticized the dearth of paperwork pertaining to the parties' business arrangement. The Hearing Officer found the authorization form provided "no meaningful way to determine the exact nature of the relationship-where it started, its terms, what he was supposed to do for her, when the relationship was *Page 16 
supposed to end, and in which `role' he was serving." Id.
at 23-24.[4] In the absence of an explicit finding by the Hearing Officer, and the sufficiency of the reasons cited above, the Court does not base its holding on the existence of an agency relationship.
Because there is legally competent evidence in the record to support the Hearing Officer's finding that DiPaolo had a fiduciary duty to Nelson to act in her best interests, the Court will not disturb the agency's factual finding. Based on the foregoing, the Court holds that the agency did not err in characterizing DiPaolo's duty to Nelson as a fiduciary duty and finding that DiPaolo's ineptitude or malfeasance — demonstrated by his retention of the insurance funds despite the ill state of repair of Nelson's vehicle — constituted a breach of that duty. Because the agency made a particularized finding regarding DiPaolo's duty to Nelson, this Court finds the Hearing Officer's decision was not clearly erroneous. Substantial rights of the Appellant have not been prejudiced.
 C Unjust Enrichment
DiPaolo asserts that the Hearing Officer committed an error of law and made a clearly erroneous factual finding when he found that DiPaolo wrongfully withheld the balance of Nelson's insurance settlement funds from her. Instead, DiPaolo characterizes the retained portion of the insurance settlement funds as a combination of his fee and the cost of damage that Nelson allegedly caused to one or more courtesy vehicles. In DiPaolo's view, he had to retain the unused portion of the fee in order to offset expenses incurred by Nelson and prevent her unjust enrichment. He argues that the Hearing *Page 17 
Officer abused his discretion by overlooking evidence of the value of the use of the courtesy vehicles and the cost of repairing them.
Regarding DiPaolo's retention of the unused portion of the insurance proceeds, the Hearing Officer held that "[a] . . . reasonable inference from these facts is that Respondent, with his knowledge of the industry, took advantage of the situation in order to inure a benefit to himself when he kept almost half of the insurance settlement." (DBR Dec. at 21.) He went on to find that the existence of any contract between Nelson and DiPaolo to use the settlement proceeds to repair one or more courtesy vehicles had not been proven by the preponderance of the evidence and that "even if there were such an agreement, it does not follow that [DiPaolo] had any right to withhold the balance of Ms. Nelson's insurance proceeds for this purpose." Id. at 22.
The Hearing Officer's conclusion regarding the propriety of deducting costs unrelated to the repair of Nelson's vehicle from the insurance proceeds is not clearly erroneous. While self-help remedies may be available to prevent unjust enrichment when land or chattels are at stake, judicial intervention is required to secure the payment of money. Restatement ofRestitution § 4 (1937). The proper course for DiPaolo to have followed would be to bring a claim in court for the costs of repair.See id.
In light of this holding, the Court need not address the issue of whether the Hearing Officer overlooked or misconstrued evidence of the cost of damage to the courtesy vehicles because such evidence is not relevant to the question of whether DiPaolo wrongfully retained the unused insurance proceeds. The agency decision was not affected by error of law or clearly erroneous in concluding that DiPaolo wrongfully withheld the balance of the insurance proceeds. *Page 18 
 D Violation of the April 1999 Consent Order
DiPaolo argues that the Hearing Officer erred when he revoked DiPaolo's appraiser license for violating the 1999 Consent Order. Specifically, DiPaolo argues his actions as an adjuster did not provide adequate cause for the Hearing Officer to revoke DiPaolo's appraiser license under the terms of the Consent Order. DiPaolo contends that the terms of the Consent Order applied only to his appraiser license. DiPaolo further argues that the terms of the Consent Order cannot be construed to apply to any future licenses.
The relevant language of the Consent Order pertaining to revocation of DiPaolo's appraiser license states: "in the event that Respondent fails to maintain compliance with the instant Consent Order or any other relevant statutory or regulatory requirements, the Respondent's [adjuster's] License will be immediately revoked after notice thereof and hearing thereon." (DBR Ex. 2.) The parties propound conflicting interpretations of the relevant language of the Consent Order. DiPaolo construes the language of the Consent Order requiring "compliance with . . . any other relevant statutory or regulatory requirements" to pertain only to the relevant statutory or regulatory requirements regarding his appraiser license. DiPaolo thus argues that the requirement imposing "compliance with . . . any other relevant statutory or regulatory requirements" does not apply to his adjuster license, which he had not obtained at the time he signed the Consent Order.
The Hearing Officer used the Consent Order as additional grounds to support his decision to revoke DiPaolo's appraiser license.See DBR Dec. at 26. The provision in *Page 19 
the Consent Order requiring DiPaolo to "maintain compliance with . . . any other relevant statutory requirements" was construed by the Hearing Officer to apply to both appraiser and adjuster licenses. See id. The Hearing Officer wrote:
 "[I]n the Consent order signed by Respondent, he explicitly admitted that he had violated both the insurance claim adjuster statute and the motor vehicle damage appraiser statute. To resolve the matter he agreed to the revocation of his appraiser license should he fail to maintain compliance with the relevant statutory requirements. As previously discussed, Respondent's conduct in his representation of Ms. Nelson constitutes cause for the revocation of his adjuster license and therefore provides cause for the revocation of his appraiser license as well. Accordingly, Respondent has triggered the provision in the Consent Order authorizing the revocation of his appraiser license." Id.
Neither of the interpretations suggested by the parties is unreasonable. The term "relevant" within the context of the Consent Order can pertain either to the relevant statutes concerning appraiser licenses, or more broadly, to statutes concerning both appraiser and adjuster licenses. DiPaolo was originally sanctioned in the Consent Order for performing adjusting services without an adjuster license. See DBR Ex. 2. It is therefore reasonable that the term "relevant" should apply to any conduct concerning adjusting services, regardless of DiPaolo's licensure status.
In the context of a consent order, the Court will apply contract law analysis. See Now Courier, LLC v. Better CarrierCorp., 965 A.2d 429, 435 (R.I. 2009) (quoting Trahan v.Trahan, 455 A.2d 1307, 1310 (R.I. 1983)). Whether a particular contract's terms are ambiguous is a question of law. CathayCathay, Inc. v. Vindalu, LLC, 962 A.2d 740 (R.I. 2009). A contract is ambiguous if it is reasonably susceptible to different constructions. Donelan v. Donelan, 741 A.2d 268, 270 (R.I. 1999). In construing what a *Page 20 
contract means, certain general principles apply. The determination of ambiguity is confined to the four corners of the agreements.See Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004). As previously noted, there exists more than one reasonable interpretation that can be applied to the term "relevant statutory or regulatory requirements." The license directly at issue in the Consent Order is the appraiser license. However, the Consent Order was implemented due to DiPaolo's actions for adjusting without a license and can be interpreted to apply to any actions that DiPaolo would take as an adjuster, regardless of his licensure status. The term "relevant" can be construed narrowly to be applied only to DiPaolo's appraiser license, or broadly to include his adjuster license. As a result, it is clear that there exists an ambiguous term within the Consent Order.
The construction of an ambiguous term in a contract is a question that must be left for the fact finder to decide. Dubis v. EastGreenwich Fire Dist., 754 A.2d 98 (R.I. 2000); seealso Clark-Fitzpatrick, Inc./Franki Foundation Co. v.Gill, 652 A.2d 440, 445 (R.I. 1994) and St. Joe Corp. v.McIver, 875 So. 2d 375 (Fla. 2004). In the current case, the Hearing Officer, acting as finder of fact, determined that the term "relevant statutory or regulatory requirements" pertained not only to DiPaolo's actions as an appraiser, but also his conduct as an adjuster. See DBR Dec. at 26. The scope of the Court's review of the Hearing Officer's interpretation of the term "relevant statutory or regulatory requirements" in the Consent Order is limited. "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Section 42-35-15(g). The Court defers to the administrative agency's factual determinations provided that they are supported by legally competent evidence. See Arnold, 822 A.2d at 167. In the context of the Consent Order, there is clear evidence that *Page 21 
supports the Hearing Officer's interpretation of the term "relevant statutory or regulatory requirements" to include DiPaolo's actions as an adjuster. The Consent Order itself dealt with DiPaolo's violations of practicing without an Insurance Claims Adjuster license, and can clearly be interpreted to apply to any future conduct of DiPaolo regarding claims adjusting. See DBR Ex. 2. This Court notes that while the Consent Order may be susceptible to multiple interpretations, the Hearing Officer's determination was rationally based upon a reasonable construction and is, therefore, entitled to deference. See Arnold, 822 A.2d at 167.
Additionally, the record reveals that DiPaolo participated in the negotiation process leading up to the Order and consented to the language chosen by the parties to be implemented in the Consent Order. It is well settled that a person who participates in the negotiations of a contract like a consent order should be charged with understanding the clear legal import of its provisions.See Trahan, 455 A.2d at 1310; see alsoUnited States v. Schafter, 600 F.2d 1251, 1253
(9th Cir. 1979) (holding a defendant who negotiated for the decree, and consented to its entry, but took no steps to modify the decree was in no position to object to it or to rely on the vagueness of its language as a defense). Thus, the Hearing Officer's charging DiPaolo with understanding the terms of the Consent Order is not affected by error of law. The record reflects that DiPaolo negotiated at arms length with the DBR for the Consent Order and made no efforts to modify the terms of the Consent Order.See DBR Dec. at 26. As such, the Hearing Officer's finding that DiPaolo's failure to comply with the "relevant statutory or regulatory requirements" warranted the revocation of his appraiser license was not an abuse of discretion. *Page 22 
DiPaolo also contends that there was a lack of evidentiary support for the Hearing Officer to find that DiPaolo's conduct constituted a violation of the Consent Order. Because there is legally competent evidence in the record to support the Hearing Officer's finding that DiPaolo's conduct clearly constituted cause for revocation of his adjuster license, the Court will not disturb the agency's factual finding. See Auto Body Association of Rhode Island,996 A.2d at 97. DiPaolo's conduct provided adequate grounds under the Consent Order for the revocation of his appraiser license. Based on the foregoing, the Court holds that the agency decision finding that the Consent Order was violated by DiPaolo's conduct as an adjuster was not clearly erroneous, and substantial rights of the Appellant were not prejudiced.
 E DBR's Choice of Sanction
Lastly, DiPaolo asserts that the Hearing Officer abused his discretion and acted in an arbitrary and capricious way by imposing the harshest possible sanction — revocation of both licenses — upon DiPaolo. In support of his argument, DiPaolo correctly points out that the purpose of disciplinary proceedings is to protect the public, not to punish. See Carter v. Cianci,482 A.2d at 1203. He further suggests that "the revocation of both licenses is so severe, [sic] as to be excessive, unwarranted, and shocking to the conscience." (DiPaolo's Mem. 25.)
The Court's limited role under the Rhode Island Administrative Procedures Act does not allow it to rule on whether an agency chose the most appropriate or the best sanction under the circumstances.Rocha v. Public Utilities Commission, 694 A.2d 722, 726 (R.I. 1997). To do so would be a substitution of the Court's judgment for the *Page 23 
agency's in contravention of § 42-35-15(g). See id.
Instead, the Court's review of the sanction imposed by an administrative agency is limited to whether the agency's findings are supported by evidence. Id. At the same time, the court may review the imposition of a sanction for abuse of discretion.Broad Street Food Market, Inc. v. United States, 720 F.2d 217,220, n. 1 (1st Cir. 1983); 73A C.J.S. Public Law andAdministrative Procedure § 417 (2004); see alsoDella Valle v. U.S. Dept. of Agriculture, 626 F. Supp. 388,391 (D.R.I. 1986) and Kulkin v. Bergland, 626 F.2d 181,185 (C.A. Mass. 1980) (ruling that an agency's choice of sanction is not to be overturned unless the reviewing court determines that the agency's decision is unwarranted in law or without justification in fact).
The relevant statutes — §§ 27-10-7 and 27-10.1-1(e) — grant the agency broad discretion to revoke claim adjuster and damage appraiser licenses either for cause or if the interests of the public are not served by the licensee's continued licensure. Therefore, the agency had the authority to revoke DiPaolo's licenses upon finding that there was cause for revocation and that the public interests were not served by allowing DiPaolo to continue to practice as an adjuster and appraiser. Secs. 27-10-7 and27-10.1-1(e).
The agency's findings were supported by competent evidence on the record. Based on testimony from Nelson and from an expert in motor vehicle damage who had conducted a post-repair appraisal of Nelson's vehicle, the Hearing Officer determined that Nelson's vehicle had not been repaired properly and that the repairs were worth only $3000 to $3300. (DBR Dec. at 7; 09/18/2006 Tr. at 13:14-19, 15:6-16:15; 10/06/2006 Tr. at 22:20-23:2, 43:11-16, 45:19-22, 46:5-47:1.) On evidence which included DiPaolo's letter to his attorney, the Hearing Officer determined that DiPaolo had *Page 24 
negotiated a settlement of $8848.20 with Nelson's insurance company. (DBR Ex. 1.) Based on evidence including the same letter, the Hearing Officer determined that DiPaolo expended only $4750 of the settlement funds to repair Nelson's vehicle. Id. From the grossly inadequate state of the repairs to Nelson's vehicle and the fact that more than $4000 of the insurance settlement funds remained unspent, the Hearing Officer inferred that DiPaolo either knew or should have known that the car was not properly repaired. (DBR Dec. at 22-23.) The Hearing Officer made a further inference that only ineptitude or malfeasance could explain DiPaolo's failure to arrange further repairs and the fact that he retained the unused portion of the insurance funds. Id. at 21. These same facts gave rise to a reasonable inference that DiPaolo had not adequately served his customer's interests. Id. at 21, 23. The Hearing Officer's inferences were reasonable and permissible. SeeRocha, 694 A.2d at 726 (explaining that where evidence gives rise to multiple reasonable inferences, the Superior Court may not substitute its preferred inference for the agency's unless the agency's chosen inference is "completely bereft of any competent evidentiary support").
Furthermore, the Hearing Officer's finding that there was no written or oral side-agreement between Nelson and DiPaolo to apply the insurance funds to fix damage to courtesy vehicles was supported by Nelson's testimony. (09/18/2006 Tr. at 63:14-64:1.) His finding that DiPaolo did not conduct himself in a competent and businesslike way is supported by the dearth of documentation of the business relationship between DiPaolo and Nelson and the work that DiPaolo did in furtherance of that relationship. See DBR Dec. at 23-24. Thus, the agency's findings that cause for revocation existed and that the *Page 25 
good of the public was not served by allowing DiPaolo to continue to work as a licensed adjuster and appraiser were supported by competent evidence.
Although DiPaolo maintains that revocation of both licenses is a harsh sanction, the Court finds the agency did not abuse its discretion. The agency found that DiPaolo's dealing with Nelson's claim "indicate[ed] a level of incompetence and lack of fitness to be licensed in this profession." Id. at 21. Furthermore, the agency found that DiPaolo's relationship with Nelson constituted a "failure to adhere to even the most basic, commonly accepted business procedures" and that DiPaolo "failed to uphold the fiduciary requirements of trustworthiness, competency, and acting in the public's interests that the statute require." Id.
at 23-24. Under these circumstances, the agency's revocation of the licenses was neither capricious nor arbitrary.
 F DiPaolo's Post-Hearing Conduct
In its memorandum, the DBR attempted to bring DiPaolo's business activities during the period since the agency revoked his adjuster and appraiser licenses to the Court's attention. It is well-settled that the Court will confine its review to an examination of the certified record, unless "application is made to the court for leave to present additional evidence" pursuant to § 42-35-15(e). Sections 42-35-15(e)-(f); Nickerson v. Reitsma, 853 A.2d 1202,1205 (R.I. 2004). Accordingly, the Court will not consider the DBR's evidence and arguments about DiPaolo's post-revocation activities. These materials played no part in the Court's decision. *Page 26 
 IV CONCLUSION
After review of the entire record, this Court finds that the DBR's decision to revoke DiPaolo's motor vehicle damage appraiser and insurance claims adjuster licenses does not violate Rhode Island law or exceed the DBR's statutory authority. The DBR's decision is not clearly erroneous in view of the reliable, probative, and substantial evidence of record. Additionally, this Court finds that the DBR's decision is not arbitrary or capricious or characterized by abuse of discretion or an unwarranted exercise of the DBR's discretion. Substantial rights of the Appellant have not been prejudiced. For the foregoing reasons, the decision of the Department of Business Regulation dated December 21, 2007, which revoked the motor vehicle damage appraiser and insurance claims adjuster licenses of Vincent DiPaolo, is affirmed. Counsel shall confer and submit forthwith for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] The DBR's investigation of DiPaolo began in 2002 with suspicions that DiPaolo was operating an auto repair shop without a license. (R. at Tab 1.) The DBR amended its Order to Show Cause Why Licenses Should Not Be Revoked in December 2005 to include allegations relating to DiPaolo's transactions with Nelson. (R. at Tab 22.) In his memorandum, DiPaolo expressed his displeasure at the amount of time that had elapsed between the original and amended orders and the fact that the DBR's website misled him into believing that he remained licensed notwithstanding the outcome of the hearing.
(DiPaolo's Mem. 2-4.) However, DiPaolo did not explain what legal ramifications, if any, should result from DBR's conduct. In response, the DBR deciphered DiPaolo's observations about the administrative process as an argument about Due Process. (DBR Mem. 6-7.) Despite this apparent invitation from the DBR to clarify his argument, DiPaolo did not raise the issue anywhere in his twelve-page, single-spaced reply memorandum. The Court therefore concludes that DiPaolo included his impressions regarding the fairness of the administrative process in his original memorandum for the purpose of providing a factual and informative background, and not for the purpose of arguing that his Due Process rights had been violated.
[2] DBR Ex. 1 is an unsigned letter from DiPaolo to his attorney, John Harwood. Attorney Harwood apparently provided DBR with a copy of this letter during pre-hearing discovery. (09/18/2006 Tr. at 25:20-22, 26:9-12.) At the hearing, DiPaolo's attorneys objected to the admission of this letter, but on grounds unrelated to the attorney-client privilege. (09/18/2006 Tr. at 25:23-31:17.) The Hearing Officer admitted the letter into evidence over DiPaolo's objections. DiPaolo opted not to testify at his hearing.
[3] An agent is a fiduciary with respect to matters within the scope of the agency. See Restatement (Third)Agency § 8.01 (2010). The existence of an agency relationship is a question for the finder of fact. Toledo v. VanWaters Rogers, Inc., 92 F.Supp.2d 44, 53 (D.R.I. 2000) (citingAmerican Underwriting Corp. v. Rhode Island Hospital TrustCo., 111 R.I. 415, 303 A.2d 121, 124 (1973)). Once this relationship is found, the agent is bound to exercise the utmost good faith, loyalty, and honesty toward the principal, regardless of whether the agency is one coupled with an interest. See
Restatement (Third) Agency § 8.01.
[4] However, if an agent-principal relationship were created by the authorization form, it would have imposed an additional fiduciary duty on behalf of DiPaolo to act with the utmost good faith, loyalty, and honesty toward Nelson.